## In re State Bank, Insolvent.

Submitted on brief by appellant, argued by respondent, Dec. 14, 1893.  Affirmed
Jan. 5, 1894.

No. 8483.

**Title to drafts left at bank for credit and collection.**

The general rule is that, upon a deposit being made by a customer in a bank, in the ordinary course of business, of money drafts or other negotiable paper, received and credited as money, the title of the money drafts ·or other paper immediately becomes the property of the bank, which becomes debtor to the depositor for the amount; and, if no other facts appeared except these, they would be held to conclusively show that such was the intention.

**Title is determined by the agreement of the parties express or implied.**

But the question is one of the agreement of the parties, and neither the fact that the indorsement of the paper by the customer was unrestricted, nor that he was, before collection, credited with the amount on his account, with the privilege of drawing against it, is conclusive on the question of the ownership of the paper.  If it was in fact delivered to the bank for collection, or for "collection and credit," a credit to the customer before collection will be deemed merely provisional, which the bank may cancel if the paper is not paid by the maker or drawer.

**Evidence considered.**

Evidence in this case considered, and *held* to justify the finding that the bank held certain drafts for collection as agents of the petitioners.

Appeal by George H. Fletcher, assignee of the State Bank of Minneapolis, from an order of the District Court of Hennepin County, *Seagrave Smith*, J., made July 14, 1893, directing him to deliver to Osborne & Clark two drafts in his possession as such assignee.

Charles F. Osborne and David F. Clark were partners in business, dealing in lumber at Minneapolis and kept a bank account with the State Bank of that city.  When they commenced doing business with the bank, the Cashier, K. Kortgaard, furnished them with a pass book. On the first page these words were printed, viz:

"This Bank in receiving checks or drafts on deposit or for collection, acts only as your agent, and beyond carefulness in selecting

agents at other points and in forwarding to them, assumes no responsibility."

In the course of the business, the Bank on receiving from Osborne & Clark their draft on their customer in another place due at a future day, would discount it at the rate of eight per cent a year and give them credit for the amount. The Bank would then forward the draft, for acceptance and collection, to some bank at the place where the customer lived. If the draft was paid at maturity the money belonged to the State Bank. If it was not paid the Bank charged Osborne & Clark in their account with the amount, and the draft was returned to them.

On April 22, 1893, Osborne & Clark drew their draft on R. Brand & Son for $917.68 and interest at eight per cent a year payable sixty days thereafter with grace (June 24) and delivered it to the State Bank and had credit as usual for the amount.

On April 25, 1893, Osborne & Clark drew another draft on Holbrook & Co. for $1,000, payable sixty days thereafter with grace (June 27) and delivered it to the State Bank and had credit as usual for the amount, less a discount at the rate of eight per cent a year.

Both drafts were duly accepted. But in June, 1893, the State Bank suspended payment and Osborne & Clark notified R. Brand & Son and Holbrook & Co. of the suspension and requested those firms not to pay, and the drafts were at maturity sent back unpaid to the State Bank, one on June 24, and the other on June 27. According to the usual practice, one, if not both of these drafts, should have been charged to the account of Osborne & Clark and returned to them. That firm then had on deposit in the State Bank $5,058.85, including the credits in April for these two drafts.

On June 27, 1893, the State Bank made an assignment of all its property to George H. Fletcher in trust for its creditors, under Laws 1881, ch. 148 as amended, and he accepted the trust. Osborne & Clark presented to the Court a petition stating these facts and alleging that the two drafts belonged to them and not to the Bank or its assignee, and prayed an order that the assignee deliver them over. Evidence was taken before the Court in chambers on July 12, 1893, by the claimants and by the assignee, and on July 14, the Court made findings and ordered that the two drafts be delivered to the claimants. Proceedings were stayed, a case made, settled, signed and filed, and

the assignee appealed to this Court. The discussion here was upon the evidence, whether or not it supported the finding of the trial Court that the parties understood in April that the title to the drafts was not to pass to the Bank.

*Hahn & Hawley*, for the assignee.

There is but one question in the case, viz: Who owned these drafts after they were discounted by the Bank, was it the Bank, or Osborne & Clark? If the Bank ever owned them, it must be conceded that it continued to own them at the time of the assignment and that the title passed to the assignee.

It appears from the evidence of every witness called, that the drafts in controversy were regularly discounted by the Bank and the net proceeds credited to Osborne & Clark. This was equivalent to a payment to Osborne & Clark of such net proceeds. If the Bank had actually paid over the cash instead of crediting the amount on account, whose property would the drafts have been? There can be but one answer. There is no pretence on the part of anybody that Osborne & Clark made a loan and put these drafts up as collateral. The Bank paid them the net proceeds. What for? If not by way of a loan it must have been by way of a purchase. The printed statement on the bank-book does not change or modify what would otherwise be the law on these facts. These drafts were not for collection, for they were discounted; neither were they on deposit, for the same reason. Hence, they were not within the terms of that printed statement.

*J. L. Dobbin*, for the claimants.

The authorities all agree that the property in a note or bill transmitted to a banker by his customer to be credited to the latter, rests in the banker, only when he has become absolutely responsible for the amount to the depositor, and that such an obligation previous to the collection of the note or bill can only be established by a contract to be expressly proved or inferred from an unequivocal course of dealing. *Scott* v. *Ocean Bank*, 23 N. Y. 289.

Kortgaard says: The Bank always in every case if the paper was not paid returned it to them or charged it to their account. It never turned the paper over to an attorney to sue, because Osborne

& Clark were able to take care of it without suit and always had a large balance in the Bank.

By the Court: Did you make any indorsement on the paper when you turned it back to them? Ans. No.

It is said that the indorsement of the check to the bank, and credit on the books of the bank, and on the pass book, are evidence of a contract by which the bank became owner of the paper. But banks always claim and exercise the right of charging back to the depositor all such checks returned unpaid. This is not consistent with the theory that title passes absolutely. The practice of allowing depositors to check against such paper is reckoned by the ablest text writers as a mere gratuitous privilege. 2 Morse Banks (3rd Ed.) §§ 583, 586; *McLeod* v. *Evans*, 66 Wis. 401; *Peak* v. *Ellicott*, 30 Kans. 156; *Carly* v. *Graves*, 85 Mich. 483.

Judge Dillon, in delivering an opinion in a similar case, says it is not unusual for bankers to credit their customers with the amount of paper of a certain character at the time of its receipt for collection, but such credits are provisional only, being made in anticipation that the paper will be promptly paid and with the right to cancel the credit if the paper is dishonored. *Levi* v. *National Bank*, 5 Dill. 104; *Trinidad Nat. Bank* v. *Denver Nat. Bank*, 4 Dill. 290.

The finding of a court upon a question of fact is of equal weight with the verdict of a jury and will not be disturbed, if there is reasonable evidence to sustain it. *Martin* v. *Brown*, 4 Minn. 283; *Kumler* v. *Ferguson*, 7 Minn. 442; *Humphrey* v. *Havens*, 12 Minn. 298; *Knoblauch* v. *Kronschnabel*, 18 Minn. 300.

MITCHELL, J. The petitioners, having drawn in their own favor two drafts on third parties, payable in sixty days, indorsed them by unrestricted indorsements, and delivered them to the State Bank, of which they were customers, and with which they had an open and current bank account. The bank credited the amount of the drafts (less the interest at eight per cent. per annum until maturity) to the credit of petitioners' account, against which they were entitled to draw by check; but, as a matter of fact, they never did draw against it, they having a balance to their credit, when the bank failed, much larger than the amount of the drafts.

Before the drafts were paid, and while they were still in its posses-

sion, the bank failed, and made an assignment of its property for the benefit of its creditors. The petitioners thereupon stopped payment of the drafts, and now ask that the assignee of the bank be ordered to return them, claiming that they are still their property, and that the bank held them as their agent for collection.

It might, at first sight, strike many that the facts that the indorsements of the petitioners were unrestricted, and that the amount of the drafts was placed to their credit, with a privilege of drawing against it by check, would be conclusive that the drafts immediately became the property of the bank; but we are satisfied that upon both principle and authority there is no hard and fast rule on the subject. There is no question but that the general rule is that, upon a deposit being made by a customer in a bank, in the ordinary course of business, of money drafts or other negotiable paper, received and credited as money, the title vests in the bank, and the money drafts or other paper immediately becomes the property of the bank; and the bank becomes debtor of the depositor for the amount.

And, if no other facts appeared except these, they would be held to conclusively show an intention of the parties that the paper should immediately become the property of the bank. But, after all, the question is one of the agreement of the parties, either express or implied, from the general course of business between them. There can be no doubt that if a draft or other paper is delivered to a bank for collection, the mere fact that the indorsement of the owner is unrestricted, will not, as between him and the bank, make the latter the owner of the property.

Neither is it conclusive upon the question of ownership of the paper that before collection the amount of it is credited to the customer's account, against which he has the privilege of drawing by check. It has been frequently held, with the approval of the best text writers, that if paper is delivered by a customer to a bank for collection, or "for collection and credit," a credit of the amount to the customer before and in anticipation of collection will be deemed merely provisional, and the privilege of drawing against it merely gratuitous, and that the bank may cancel the credit, or charge back the paper to the customer's account, if it is not paid by the maker or drawee. *Giles* v. *Perkins*, 9 East, 12; *Levi* v. *Na-*

*tional Bank,* 5 Dill. 104; *Balbach* v. *Frelinghuysen,* 15 Fed. R. 675.

The right of banks to do this in case of the deposit of checks on other banks, without any special contract, is generally exercised and recognized. This is inconsistent with the idea that the title to the checks passes absolutely to the bank, and is only consistent with the theory that the bank is the agent of the customer for collection, notwithstanding the credit of the latter. 2 Morse, Banks, § 586; *Hoffman* v. *Jersey City Bank,* 46 N. J. Law, 604.

Of course, in all such cases the banker, like a factor, has a lien for advances made on the faith of the paper, and consequently the claim of the customer may be modified by the state of his account. No such question, however, arises in this case; the balance of the petitioners' account, independent of these drafts, being in their favor at the time of the failure of the bank.

The authorities on this subject are quite fully collated in Morse on Banking, § 573 et seq. See, also, Paley, Ag. 91, note; and Story, Ag. § 228, note 2.

In examination of the cases there should be kept in mind the distinction between those where the paper was still in the hands of the bank, or its assignee in bankruptcy, and those where the bank, clothed by the customer with the *indicia* of ownership, had transferred the paper or its proceeds to a *bona fide* purchaser. The distinction is clear on principle, and is generally recognized by the authorities.

It remains to apply these principles to the facts of this case. The petitioners commenced doing business with this bank over seven years ago. When they opened an account with the bank they received a pass book, upon which their debits and credits were entered. On the front leaf of this book is the following statement:

"This bank, in receiving checks or drafts on deposit or for collection, acts only as your agent, and, beyond carefulness in selecting agents at other points and in forwarding to them, assumes no responsibility."

The language of this statement will not admit of the construction claimed for it by the assignee,—that it refers only to the paper left with the bank for collection without credit to the account of the customer. What was intended by it is best shown by the testimony of the cashier (afterwards president) of the bank. He says:

"The intention of it undoubtedly is this: that if we should have to send the draft for collection at Chicago or Oshkosh or wherever the case may be, and if the bank up there should send us paper that subsequently turned out to be no good, it would not fall on the State Bank, but on the party who has discounted or sold it. Question. And you regard yourselves as the agents of Osborne & Clark? Answer. In case the collecting bank should fail to collect it. They [the collecting correspondent] might send a draft on Chicago or New York, and the draft might be no good when we got it there. That is the reason that these lines are printed in there."

The purport of all this is that, beyond the exercise of care in the selection of correspondents and forwarding the paper to them, the entire risk of collection was on the customer; and only when the proceeds were actually received by the bank did it unconditionally assume the relation of debtor for the amount. It is needless to suggest that the bank could not be agent for collection and owner of the paper at the same time. The evidence also is that there was no subsequent conversation between the petitioners and the bank officers "changing this statement." During the years that followed, the petitioners were accustomed. to deposit paper, and take credit for it on account, the same as in the case of these drafts; and whenever any of the paper came back uncollected the bank charged it up to their account, or they gave their check for it, and took back the paper. It does not appear that such paper was ever protested for nonpayment, or that the petitioners ever waived protest on it, or that its return to them in the manner indicated had any reference to any liability on their part as indorsers. On the contrary, it appears that this was done in accordance with a general understanding between the parties that whenever any of the paper was not paid the bank was either to charge it up to the petitioners' account, or that they would give their check for it, and take it up. It does appear that, when the petitioners were doubtful about paper being paid, they would give it to the bank for collection without taking any credit for it. It likewise appears that, where credit was given for the paper, the bank would enter it among their discounts; while, if no credit was given, they would enter it among their collections. But, as this was a mere matter of bookkeeping, of which the petitioners had no knowledge, it is a matter of little or no weight. There

is other evidence having more or less bearing upon the question, but what we have stated is of itself sufficient to justify the findings of the court that the bank held these drafts merely as agents for collection, that it did not assume the absolute relation of debtor for the amount until collected and received, and that the credit before collection was merely conditional or provisional.

Order affirmed.

(Opinion published 57 N. W. Rep. 336.)